UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


G. SCOTT WHITING,

       Plaintiff,

                                   Case No. 08-12991

-vs-                                 Hon: AVERN COHN

ALLSTATE INSURANCE COMPANY,

       Defendant.

_____/


**MEMORANDUM AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY**

**JUDGMENT**

**I. INTRODUCTION**

       This is a wrongful termination and defamation case arising under Michigan law.

Jurisdiction is based on diversity. Defendant Allstate Insurance Company (Allstate) is

an insurance provider domiciled in Illinois. Plaintiff G. Scott Whiting (Whiting) is a

Michigan resident and former employee of Allstate. The amount in controversy exceeds

$75,000. On June 11, 2007 Allstate terminated Whiting's employment because he

delayed insurance payments from one quarter to the next in violation of Allstate policies

and Code of Ethics. Whiting claims the he complied with Allstate's policies in delaying

the payment and was terminated in retaliation for disclosing the policies. He also claims

that Allstate defamed him by publishing and republishing false statements that he

violated Allstate policies and Code of Ethics. His complaint is in two counts:

       (I)      Termination in Violation of Public Policy

(II)    Defamation

Now before the Court is Allstate's motion for summary judgment.  Allstate seeks

summary judgment on Count I on grounds that Whiting's claims fails, as a matter of law,

to meet the elements of a termination in violation of public policy.  Allstate seeks

summary judgment on Count II on grounds that (1) the allegedly false statements are

either true or are opinions, and (2) the allegedly false statements are privileged.  For the

reasons that follow, the motion will be granted.

## II.  FACTS

### A.

Whiting began working for Allstate in 1986.  He had a good reputation within the

company and received favorable reviews.  At all time relevant to this action he was

employed as a property claims manager with the title of Frontline Process Expert.  In

this position he oversaw a number of claims adjustors in Michigan and Indiana.

On June 27, 2006 Whiting sent an e-mail to Dennis Shelton (Shelton), a claims

adjustor in Indiana, instructing him  to delay a claim payment until July.  A notation of

the delay was included in the customer's file.  The purpose of the delay was to ensure

that the claim payment was charged to the third quarter of 2006 rather than the second

quarter.

In August 2006, a compliance manager at Allstate learned of the delayed

payment and notified Thomas Hemming (Hemming), Whiting's immediate supervisor.

After Hemming learned of the delayed payment, Allstate's internal investigator, Luke

Yang (Yang), looked into the matter.  During the investigation, Whiting admitted that he

instructed Shelton to delay the payment.  Whiting also told Yang that his office

manager, Lionel Beckles (Beckles), had instructed him to delay the payment.[1]  Beckles

denied having done so.  Yang's report included this information.

After receiving Yang's report Dan Hebel (Hebel), Vice President of the Eastern

Territory of Field Claims, and Susan Rosborough (Rosborough), Allstate's in-house

counsel, directed Christi Rushing (Rushing), director of Human Resources, to prepare a

termination request for Whiting.  The request stated in part:

> Information recently became available that indicated
> Whiting may have violated company policy by directing an
> adjustor to delay payments on a claim.  An attorney client
> privileged investigation was conducted in which it was
> determined that Whiting instructed a remote adjustor to
> delay a claim payment with a significant dollar amount until
> after the end of the second quarter in 2006.
> . . .
> Whiting violated the Allstate Code of Ethics (Exhibit 1
> – HR Policy Guide, Chapter 2: Corporate Compliance) by
> delaying payments on a claim.
> **Allstate Code of Ethics – Integrity and Compliance**
> "As one of Allstate's core values, integrity must be
> part of all business goals and activities.  We treat every
> stakeholder accordingly.
> > We act honestly and deal fairly and ethically
> > with customers, suppliers, competitors, and
> > other employees."
> Chapter 14 of the HR Policy Guide outlines the
> following examples of conduct leading to immediate
> termination (Exhibit 2):
> **Terminations – Conduct Leading to Immediate**
> **Termination**
> "Dishonesty, such as theft, fraud, embezzlement, or
> falsification of Company documents."
> and
> "Conduct which causes management to lose
> confidence in the employee's ability to perform his/her job or

[1]Although Hemming was Whiting's direct supervisor, they worked in different offices.  Beckles was the senior manager in the Southfield, Michigan office where Whiting worked.

which adversely reflects upon or affects Allstate or its
employees."

(Emphasis in original).  Because Whiting had been employed by Allstate for more than

ten years, the termination request had to be signed by three managers.  The termination

request was signed by Hebel, Harry Wright (Wright), a Claim Field Director overseeing

Whiting's region, and Karleen Zuzich (Zuzich), Assistant Vice President for Human

Resources.

On June 11, 2007 Whiting's employment was officially terminated.

After Whiting was terminated, rumors circulated at Allstate regarding his

departure.  Whiting said that he received a call from John Barnett, an Allstate employee

in a different office, who had heard that Whiting was terminated for violating Allstate's

Code of Ethics.  In addition, Deborah Walker, an employee in Whiting's office said that

she heard through the Allstate rumor mill that Whiting was terminated for an ethics

violation.

Although Whiting was officially terminated for violating Allstate's Code of Ethics,

Beckles expressed a belief that Whiting was terminated because his instructions to

Shelton were in writing, leaving a paper trail.

**B.**

Whiting asserts that delaying claim payments was part of Allstate's unwritten

corporate policy of "managing severities."  A number of Allstate employees said that

Allstate's management used the term "managing severities" and that the practice was

condoned or encouraged.  However, the term was not formally defined and was

assigned a variety of meanings by Allstate employees.

4

Beckles, the former manager in charge of Allstate's Michigan office, said that he received performance targets from senior management related to a number of metrics, including the average size of claim payouts. He said that it was the responsibility of managers at his level to implement strategies to meet these performance targets. Success in meeting the goals was one criterion for receiving bonuses, fringe benefits, and office service awards. Beckles said he was chastised and threatened with termination when he failed to meet them.

Beckles said that he implemented a strategy of "managing severities" in order to achieve his performance targets. One strategy that he used when he was at risk of missing his average claim payout target was to delay the payment of large claims while encouraging the payment of small claims. To do this, he would reduce or remove his employees' authorization to settle large claims. This would cause his employees to settle small claims that remained within their authority. Only a few managers had authority to settle the larger claims, creating a bottleneck which delayed their payment relative to small claims. A number of Beckles' employees, including Paul Regula, Deborah Walker, Dianne Sura, and Joanne Katzman, confirmed that their authorization had been reduced in this manner and referred to the practice as managing severities. Beckles did not say that he directly told employees to stop paying larger claims that had been authorized. Instead, he said that he created additional levels of oversight which added bureaucracy and delayed the authorization of claims.

Although Beckles denied that he directly told employees to delay making payments, Whiting produced a number of e-mails which appear to contradict that assertion. In one e-mail, Beckles made a request to delay payments until after the end

of the first quarter of 2004 in order to increase the office's chances of winning an award. However, the recipients of this e-mail have been redacted. Whiting also produced several e-mails sent to employees in Allstate's Michigan office that directed them to delay payments. However, Whiting was not among the recipients and the names of the senders have been redacted.

Beckles also said that he was required to submit "action plans" to senior managers which described the practices that he intended to implement in order to achieve his performance targets. He said that these actions plans included strategies such as modifying employees' authorizations and increasing bureaucracy in order to alter the timing of claim payments. He said that Wright and Hebel were aware of these practices and would have understood that he was making the changes in order to meet his performance goals. However, there is no evidence suggesting that Wright and Hebel authorized or otherwise ordered Beckles to implement these policies. Instead Beckles suggested that managers in his position were given freedom to design strategies to meet their performance goals. Moreover, there is no evidence, beyond the speculation of Whiting and Beckles, which suggests that these practices were employed in other Allstate offices as part of a centralized corporate policy.

Whiting confirmed Beckles' testimony and said that both Beckles and Hemming regularly instructed him to delay claims from one month to the next in order to meet performance targets. Hemming denied instructing his employees to delay claims. Whiting also said that the instructions were verbal and that he was not given a written policy statement which instructed him to delay payments. Finally, Whiting said that he complained to both Hemming and Beckles about this policy with no success and

subsequently contacted Allstate's anonymous hotline to renew his complaint. Whiting said that he called anonymously and refused to give specific details that would reveal his identity because he did not want anyone to know that he had made the complaint.

### III.  STANDARD OF REVIEW

Summary judgment is appropriate when the evidence submitted shows that "there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56©. "A party claiming relief may move, with or without supporting affidavits, for summary judgment on all or part of the claim." Fed. R. Civ. P. 56(a).  Accordingly, the movant bears the initial responsibility of informing the court of the basis for its motion, and identifying what it believes demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When a motion for summary judgment is properly made and supported, an opposing party must set out specific facts showing a genuine issue for trial.  Fed. R. Civ. P. 56(e).  All facts and inferences should be viewed in the light most favorable to the nonmoving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970).

### IV.  ANALYSIS

#### A. The Law

##### 1.  Termination in Violation of Public Policy

Under Michigan law, employment is usually at will.  However, "some grounds for disciplining an employee are so contrary to public policy as to be actionable." Suchodolski v. Michigan Consolidated Gas Co., 412 Mich. 692, 695 (1982).  A discharge may be against

public policy when:

> (1) the employee is discharged in violation of an explicit legislative statement prohibiting discharge of employees who act in accordance with a statutory right or duty, (2) the employee is discharged for the failure or refusal to violate the law in the course of employment, and (3) the employee is discharged for exercising a right conferred by a well established legislative enactment.

Edelberg v. Leco Corp., 236 Mich. App. 177, 180 (1999) (citing Suchodolski, 412 Mich. at 695-96). The Michigan Supreme Court has reiterated that the three public policy exceptions identified in Suchodolski are "examples" and that "an employer is not free to discharge an employee at will when the reason for the discharge contravenes public policy. McNeil v. Charlevoix County, 484 Mich. 69, 79 (2009).

While McNeil recognized that the public policy exception may be broader than the Suchodolski examples, it merely restated existing Michigan law and did not seek to alter existing precedent. Id. A review of prior cases examining the public policy exception suggests that a violation must involve a situation that is similar to one of the examples in Suchodolski. For example, in Garavaglia v. Centra, Inc. an employer was found liable for terminating an employee at the behest of a union because the NLRA conferred a right to represent fellow employees without union influence. 211 Mich. App. 625, 631 (1995). Still, the court felt it necessary to locate its holding within the Suchodolski examples. Id. at 621-32 ("Under these circumstances, the third prong of Suchodolski is satisfied because a cause of action may be had where the alleged reason for the discharge is the employee's exercise of a right conferred by a well-established legislative enactment."). Similarly the Michigan Supreme Court upheld smoking regulations which were promulgated by a multi-

county district health department and stated that "an employer cannot discharge, refuse to hire, or otherwise retaliate against a person for exercising his or her right to a smoke-free environment." McNeil, 484 Mich. at 78-79. In response to an argument that the regulation violated an employer's right to discharge an employee at will, the court noted that the regulation was not a legislative enactment, but held that "the regulation's restriction on the general right to discharge an employee at will is consistent with the general exceptions to that doctrine set forth in Suchodolski." Id. at 80 (emphasis added).

Thus, an employer can be liable for termination in violation of public policy even if the basis for the termination falls outside of the three examples in Suchodolski. However, these examples are relevant and any exception relied upon by a plaintiff must be "consistent with" them. Although public policy can be construed very broadly, the effect of Suchodolski and its progeny is to limit the scope of termination in violation of public policy to those situations that fall within the Suchodolski examples or are closely related to them.

### 2. Defamation

### a. The Law

"A communication is defamatory if it tends to lower an individual's reputation in the community or deters third persons from associating or dealing with that individual." Ireland v. Edwards, 230 Mich. App. 607, 614 (1998). To prevail on a defamation claim under Michigan law. A plaintiff must prove the following four elements:

> 1) a false and defamatory statement concerning the plaintiff, 2) an unprivileged communication to a third party, 3) fault amounting to at least negligence on the part of the publisher, and 4) either actionability of the statement irrespective of special harm, or the existence of special harm caused by the publication.

Locricchio v. Evening News Ass'n, 438 Mich. 84, 115-16 (1991).

## b. False and Defamatory Statement

The first element of defamation requires that the defendant make a false and defamatory statement concerning the plaintiff. A defendant who makes a truthful statement cannot be liable for defamation. Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 770 (1986); Fisher v. Detroit Free Press, Inc., 158 Mich. App. 409, 414 (1987) ("[I]f the gist, the sting, of the article is substantially true, the defendant is not liable.").

Because a statement must be "provable as false" to be actionable, some statements of opinion are excluded as non-defamatory. Ireland, 230 Mich. App. at 616 (citing Milkovich v. Lorain Journal Co., 497 U.S. 1, 17-20 (1990)). However, a speaker or writer cannot avoid liability merely by couching an assertion of fact as an opinion. Milkovich, 497 U.S. at 19. Instead, a court must consider whether "an expression of opinion is capable of bearing a defamatory meaning because it may reasonably be understood to imply the assertion of undisclosed facts that justify the expressed opinion about the plaintiff or his conduct." Falls v. Sporting News Publishing Co., 834 F.2d 611, 616 (6th Cir. 1987). To explain when an opinion may be actionable, the Sixth Circuit employed the following examples from the Restatement (Second) of Torts:

> 3. A writes to B about his neighbor C: "I think he must be an alcoholic." A jury might find that this was not just an expression of opinion but that it implied that A knew undisclosed facts that would justify the opinion.
> 4. A writes to B about his neighbor C: "He moved in six months ago. He works downtown, and I have seen him during that time only twice, in his backyard around 4:30 seated in a deck chair with a portable radio listening to a news broadcast, and with a drink in his hand. I think he must be an alcoholic." The

> statements indicates the facts on which the expression of
> opinion was based and does not imply others.  These facts are
> not defamatory and A is not liable for defamation.

Id. (quoting Restatement (Second) of Torts § 566, illus. 3-4 (1977)).  In other words, when

the allegedly defamatory statement is an expression of opinion, a court must consider

whether it is based on disclosed or undisclosed facts.  If it is based on disclosed facts,

readers or listeners can assess the facts independently and reach their own conclusion.

However, a speaker or writer who discloses the factual basis for an expression of opinion

may still be liable for defamation if the disclosed facts are false.  E.g. TMJ Implants, Inc.

v. Aetna, Inc., 498 F.3d 1175, 1184-85 (10th Cir. 2007) (citing Restatement (Second) of

Torts § 566, cmt. c, illus 5)).

### c. Privileged Communication

Under Michigan law, a statement that is privileged cannot be defamatory.  Michigan

recognizes an employer's qualified privilege to make defamatory statements to employees

with an interest in the subject.  Merritt v. Detroit Metropolitan Hospital, 81 Mich. App. 279,

285 (1978) ("Employees responsible for hiring and firing are entitled to hear accusations

of employee misconduct which warrant dismissal and preclude rehiring.").  This privilege

does not extend beyond those employees who are involved in hiring and firing or beyond

the specific issue of the employee's continued employment.  See Sias v. General Motors

Corp., 372 Mich. 542, 548 (1964) (holding that employer's privilege did not extent to

communication to employee's coworkers for purpose of restoring morale and quieting

rumors).  Thus a court must consider both the purpose of the allegedly defamatory

statement as well as the recipient of the publication.

Even if an initial communication is privileged, an employer may be liable for defamation if the statement is republished. "The general rule is that one who publishes a defamatory statement is liable for the injurious consequences of its repetition where the repetition is the natural and probable result of the original publication." Tumbarella v. The Kroger Co., 85 Mich. App. 482, 496 (1978). In Tumbarella, the plaintiff was discharged for theft and the defendant company informed nearby stores out of concern that the plaintiff might seek reemployment. Id. at 495. While the initial publication of the letter was privileged, the court found that defendant should have expected republication of the letter because it was not marked confidential and contained inflammatory information regarding the plaintiff. Id. at 496. However, in Cole v. Knoll, Inc., 984 F. Supp. 1117 (W.D. Mich. 1997), the District Court for the Western District of Michigan held that a plaintiff must produce some evidence of republication. In that case, the plaintiff was terminated after a meeting where several managers determined, among other things, that the plaintiff had sexually harassed another worker. Id. at 1125. The court stated "He cannot pinpoint any particular statement made by any particular supervisory employee, but merely asserts that rumors of his alleged sexual harassment were circulating in the workplace. This is insufficient." Id. at 1134. The circulation of a rumor is not sufficient to prove that republication was the "natural and probable consequence" of an initially privileged communication. A plaintiff must make some factual showing that the republication was expected.

### d. Malicious Publication

An employer who acts with actual malice in defaming an employee cannot rely on qualified privilege. An employee acts with actual malice by publishing a statement "with

knowledge that it was false or with reckless disregard of whether it was false or not." Peisner v. Detroit Free Press, Inc., 82 Mich. App. 153, 164 (1978) (quoting New York Times v. Sullivan, 376 U.S. 245, 280 (1964).

## B. DISCUSSION

### 1. Termination in Violation of Public Policy

Allstate contends that Whiting was terminated because he violated its Code of Ethics by directing Shelton to delay a claim payment. Whiting asserts that Allstate's stated reason for terminating him is pretextual. He asserts that he was terminated because he complained about the practice of delaying payments or because he documented a payment delay which created evidence that Allstate had violated the Michigan Uniform Trade Practices Act, MICH. COMP. LAWS § 500.2001 et seq..

### a.

Whiting has provided no evidence suggesting that he was terminated for complaining about the practice of delaying claim payments. Whiting relies exclusively on his own deposition testimony that he complained to his immediate supervisors, Hemming and Beckles, and lodged an anonymous compliant with Allstate's hotline.[2] There is no evidence that the individuals involved in his termination – Rosborough, Rushing, Hebel, Wright, and Zuzich – had any knowledge of his complaints. Whiting does not suggest that Beckles or Hemming told them of his complaints. He says that he called the Allstate Hotline anonymously so that he could not be identified as the caller. Further, the complaints

---

[2] Whiting also cites the deposition testimony of Kathleen Mahne and Karleen Zuzich. Mahne did not recall any complaints submitted via the Allstate Hotline. Zuzich merely described the process by which the hotline worked.

Whiting describes were made approximately two years before he was terminated, making them even more tangential to his termination. Under these circumstances, there is no basis on which a reasonable jury could find that Whiting's prior complaints were the true reason for his termination.

In addition, there is no precedent suggesting that an employer would be liable for terminating an employee who makes internal complaints. In an unpublished opinion, the Sixth Circuit reviewed existing Michigan case law and found that such a cause of action did not exist. Cushman-Lagerstrom v. Citizens Insurance Company of America, 72 Fed. App'x 322, 328-330 (6th Cir. 2003). The cases cited by Whiting are all distinguishable. In Authier v. Ginsberg, 757 F.2d 796, 800-02 (6th Cir. 1985), the Sixth Circuit reached no conclusion regarding internal complaints because it found that the plaintiff's common law claim was preempted by ERISA. In Meurry v. Connie Kalitta Services/American International Airways, Inc., 1999 WL 357774, at *2 (6th Cir. May 20, 1999), the Sixth Circuit found that pilots were required by FAA law to report safety violations to their superiors, meaning that their termination for making internal complaints was technically a termination for refusal to violate the law. Finally, Whiting relies on Watassek v. Michigan Department of Mental Health, 143 Mich. App. 556, 564 (1985), which recognized a cause of action for termination in violation of public policy where an employee alleged that he was terminated for reporting to superiors that employees had abused mental health patients. However, Watassek is no longer good law because Michigan's Whistleblowers' Protection Act, MICH. COMP. LAWS § 15.361 et seq., provides the exclusive remedy for employees terminated in retaliation for reporting violations of law and subsequent Michigan courts have held that there is no common law cause of action for discharge in retaliation for internal reporting of violations

of law.  <u>Cushman-Lagerstrom</u>, 72 Fed. App'x at 329-30 (collecting cases).

**b.**

Whiting's second assertion is that he was terminated because he made a written request to delay payments which created documented evidence of Allstate's violation of state law.  Viewing the evidence in a light favorable to Whiting, a reasonable jury could find that Beckles employed a variety of means in his office to delay claim payments in an effort to meet management performance targets.  A reasonable jury could also find that Whiting would not have been terminated if his request to Shelton had not been in writing and left a paper trail.  However, there is no evidence suggesting that there was a centralized corporate-wide policy of delaying claim payments.  At most, Whiting can establish that some managers may have been aware that Beckles instituted policies that increased the bureaucracy and delayed the payment of some claims.  Therefore, the Court will assume for the purposes of this motion that the practice of delaying payments was Allstate's policy in Whiting's office and that Whiting was terminated for creating a written record of the practice.

Even under those facts, Whiting cannot prove that he was terminated in violation of public policy.  Whiting's actions do not fit within any of the examples cited in <u>Suchodolski</u>. He was not terminated for refusing to violate the law; he followed Allstate's policy.  He did not act in accordance with a statutory right or duty.  He did not exercise a right conferred by a well established legislative enactment.  All of the examples cited in <u>Suchodolski</u> focus on employees who take action which is encouraged by public policy:  to exercise rights or to refuse to violate the law.  Whiting's action does not fit this pattern.  Whether memorialized in writing or not, Whiting's action in delaying claims is arguably against public

policy.  It is certainly not consistent with it.  The termination in violation of public policy exception is reserved for employees who act in the interest of public policy and are punished by their employers for taking that action.  Ultimately, an employee is responsible for his own actions and cannot maintain a claim when he engaged in the actions that violate public policy.

Whiting is a sympathetic plaintiff.  He asserts that he faithfully followed Allstate's policy along with a host of other managers and claims adjusters, yet was singled out for adverse action.  He claims that he was punished not for engaging in the practice of delaying claims – which was Allstate's unwritten policy – but for doing so in a sloppy manner which exposed Allstate to potential liability.  However, an employee remains responsible for his own actions, regardless of a company's policies.  Whiting complied with the corporate policy that he now claims violates Michigan law and is thus complicit in Allstate's actions.  The exception to the common law rule of at will employment is designed to protect those workers who stand up to improper or illegal corporate practice by exercising their rights and refusing to violate the law.  Whiting did not do this.

## 2. Defamation

Whiting's defamation claims are all based on statements from the Termination Request.  This request includes the following three statements which may be considered defamatory:

1. "Whiting may have violated company policy."

2. "Whiting instructed a remote adjuster to delay a claim payment."

3. "Whiting violated the Allstate Code of Ethics."

Allstate contends that these statements are either true or protected expressions of

opinion and are privileged communication.

### a. True Statements and Protected Opinions

Whiting agrees that the statement that he instructed a remote adjuster to delay a claim payment is true. As a result, this statement cannot form the basis of a defamation claim. Instead Whiting asserts that the statements that he violated Allstate policy and Allstate's Code of Ethics are false because Allstate had a policy of delaying claim payments. Allstate asserts that these statements are merely expressions of opinion based on Allstate's interpretation of the Code of Ethics.

When taken in full context, the statements that form the basis of Whiting's claim are expressions of opinion that are based on fully disclosed information. The first statement is "Whiting may have violated company ethics policy by directing an adjuster to delay payments on a claim." The second statement is "Whiting violated the Allstate Code of Ethics . . . by delaying payments on a claim." These statements are followed by the sections of the Code of Ethics which were allegedly violated. They relate to a single disclosed fact – that Whiting instructed an adjuster to delay a claim payment. They also include an opinion – that ordering an adjuster to delay a claim payment violates Allstate's Code of Ethics. One can agree or disagree with this opinion, but it cannot be classified as true or false. Because the termination request discloses all of the facts on which the opinions are based, they are protected opinions and are not defamatory. A reader of the Termination Request knows the basis for the opinion that Whiting violated Allstate's Code of Ethics and can reach an independent opinion based on those disclosed facts.

Whiting asserts that the statements in the Termination Request that he violated company policy and violated the Allstate Code of Ethics are false because Allstate's

policy was to briefly delay claim payments into later time periods. At most, Whiting can establish that Allstate had conflicting policies. It does not change the fact that Whiting instructed Shelton to delay the claim payment or the reasonableness of the opinion that such action violated Allstate's ethical requirement to "act honestly and deal fairly and ethically with customers." Whiting also asserts that the statement is false because Allstate's Code of Ethics did not explicitly prohibit the delay of claim payments until after he was terminated. The explicit prohibition of delaying claim payments after Whiting was terminated does not mean that such activity was permitted or condoned before that time. It is simply not relevant to the issue of whether or not Whiting's actions violated the Code of Ethics as it existed in 2006-2007.

Expressions of opinion are protected so long as they are based on fully disclosed facts. This includes opinions which reflect poorly on their subject. In many cases, the negative impact of the opinion could be diminished by adding additional context explaining the subject's actions. This may be one of those cases. However, the law does not place such a burden on speakers and writers. Allstate's Termination Request disclosed undisputed facts and then drew conclusions from them in the form of opinions. Under these circumstances, Allstate cannot be liable for defamation.

**b. Privilege**

Whiting identifies a number of specific statements that he claims were defamatory: (1) Hebel and Rosborough's statements to Rushing asking her to prepare a Termination Request, (2) Rushing's submission of the Termination Request to Wright,

Zuzich, and Hebel, and (3) Wright, Zuzich, and Hebel's signing of the Termination Request.[3]  Allstate asserts that each of these statements was privileged.

Pursuant to Allstate's policy, an employee with ten years of experience cannot be terminated unless a Termination Request is signed by three managers.  All of the allegedly defamatory statements identified by Whiting were part of that process.  After they determined that Whiting had violated the Code of Ethics, Hebel and Rosborough were privileged to ask Rushing to prepare a Termination Request.  Rushing was privileged to draft the request and circulate it to the required signatories.  Those signatories were privileged to sign and return it.  As a result all of these actions were subject to a qualified privilege.

Whiting also asserts that Allstate is liable for the republication of the defamatory statements among Allstate employees.  He relies first on a phone call in which John Barrett told whiting that he had heard that Whiting was fired for a violation of ethics.  But Barrett did not state where he had heard the information and Whiting did not ask.  Whiting also relies on deposition testimony from Walker who said that she heard through the "Allstate rumor mill" that Whiting was fired, but did not initially know why.  Later, she said that she heard through the rumor mill that it "had something to do with ethics."

As in Cole, Whiting "cannot pinpoint any particular statement made by any particular supervisory employee, but merely asserts that rumors of his alleged [violation]

---

[3]Whiting also asserts that Rushing defamed him by informing him that he had been terminated.  This cannot constitute defamation because it was not published to a third party.

were circulating in the workplace." Cole, 984 F. Supp. at 1134. As the court in Cole held, this is insufficient. Whiting has only established that Allstate's managers followed the proper procedure in requesting, drafting, and signing the Termination Request. There is no evidence suggesting that they were careless in discussing his termination or in storing the physical document. There is simply no showing that republication would be the "natural and probable result" of their action. To find otherwise would make Allstate strictly liable for defamation once the corporate "rumor mill" learned of or speculates about an employee's termination. This would eviscerate the privilege completely because there is always a potential for republication, even if proper safeguards are taken to prevent it. In Sias, 372 Mich. at 548, corporate officers were liable for republication when they directly informed employees of the reasons for an employee's termination to improve morale. In Tumbarella, 85 Mich. App. at 796, the corporate officers were liable for republication when they sent a letter to other stores without ensuring that the information would remain confidential. In contrast, there is nothing to suggest that republication would be the "natural and probable consequence" of the creation of the Termination Request. See id. Therefore, Allstate cannot be held liable for the rumors that may have circulated regarding Whiting's termination.

### c. Malicious Publication

Finally, Whiting asserts that Wright and Hebel acted with malice because they knew or should have known that Whiting's instruction to delay a claim payment did not really violate Allstate's true policies and practices. Whiting asserts that Allstate's policy of "managing severities" was known to and encouraged by upper management and that Wright and Hebel should have been aware of the practice.

20

However, to the extent that Whiting has established a corporate wide practice of managing severities, that policy did not encompass Whiting's actions. While the meaning of the term "managing severities" is subject to some dispute, there is no evidence that management did more than set performance targets. To the extent that the managers were aware of the practices which were implemented to meet these performance goals, their information was based on the action plans submitted by Beckles and his colleagues. But there is no evidence suggesting that these actions plans included explicit instructions to delay authorized claims. Rather, they included strategies that increased bureaucracy and slowed the authorization process for certain claims. Even if Wright and Hebel were aware of those practices, there is no reason to believe that they should have equated Beckles' strategies with Whiting's instruction to delay an otherwise authorized claim.

All of the strategies that Beckles submitted in his action plans were consistent with the Allstate's ethical rule to pay claims once they were authorized. He simply designed methods to delay the authorization of some claims. Even if Hebel and Wright were aware of these practices, they did not act maliciously in stating that Whiting had violated Allstate's Code of Ethics by instructing Shelton to delay a claim payment. Although Whiting's action may have had the same result, it utilized different means which were not part of the Allstate policies communicated to Hebel and Wright. Thus there is no evidence suggesting that Hebel and Wright knew or had reason to know that Whiting's actions were consistent with any of Allstate's policies.

### V. CONCLUSION

For the reasons stated above, Allstate's motion for summary judgment is

GRANTED.  The case is DISMISSED.

SO ORDERED.


                                        S/Avern Cohn
                                       AVERN COHN
                                       UNITED STATES DISTRICT JUDGE


      Dated:  March 15, 2010


      I hereby certify that a copy of the foregoing document was mailed to the
attorneys of record on this date, March 15, 2010, by electronic and/or ordinary mail.


                                        S/Julie Owens
                                       Case Manager, (313) 234-5160